FILED

12/26/2018

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2018

IN RE FREDERICK S.

**Appeal from the Juvenile Court for Haywood County**
**No. 2017-JV-9703   J. Roland Reid, Judge**

_____

**No. W2018-00941-COA-R3-PT**
_____

Mother appeals the termination of her parental rights to her child.  The juvenile court found three statutory grounds for termination: (1) abandonment by failure to establish a suitable home; (2) persistence of conditions; and (3) mental incompetence.  The court also found that termination of Mother's parental rights was in the child's best interest. We conclude that the record contains clear and convincing evidence to support two of the three statutory grounds for termination.  We further conclude that the record contains clear and convincing evidence that termination is in the child's best interest.  So we affirm the termination of Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which THOMAS R. FRIERSON II and ARNOLD B. GOLDIN, JJ., joined.

Bob C. Hooper, Brownsville, Tennessee, for the appellant, Katie S.

Herbert H. Slatery III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

**A.**

In September 2016, Katie S. ("Mother") gave birth to a son, Frederick.  Shortly after his birth, the Tennessee Department of Children's Services ("DCS") investigated allegations of cocaine and marijuana usage by Mother and environmental neglect.

Mother had tested positive for marijuana and cocaine during prenatal medical visits, and she tested positive for marijuana at Frederick's birth. Medical staff also expressed concerns about Mother's ability to properly care for an infant. She reportedly had difficulty understanding how to properly hold, feed, and console Frederick and appeared unconcerned about the child's needs.

A DCS employee met with Mother in the hospital to discuss the allegations. During the meeting, Mother submitted to a urine drug screen and tested positive for benzodiazepines.

Two days later, a DCS investigator visited Mother's home. Mother lived with her mother ("Grandmother"), who had a conservatorship over Mother. The investigator found uneven floors and holes, which were covered by rugs. One room in the home was completely inaccessible. Only one light fixture worked in the home. Mother and Grandmother used lamps for lighting. Still, many electrical outlets throughout the home were burned out. In what would have been the child's room, two panes of a window had aluminum foil substituted for the glass, and the air-conditioning unit was inoperable.

On September 14, 2016, at the request of DCS, the Juvenile Court of Haywood County, Tennessee, entered a protective custody order, awarding temporary legal custody of Frederick to DCS. The next day DCS filed a petition to adjudicate the child dependent and neglected.

During the pendency of the dependency and neglect case, a DCS family services worker ("FSW") provided services to address the condition of the home of Mother and Grandmother and to address Mother's mental health and substance abuse issues. The FSW spoke with Grandmother about making application for low income housing, but despite her home's condition, Grandmother refused to leave. The FSW also spoke with a social service agency about assisting with home repairs, but the agency declined to assist due to the nature of the problems.

The FSW observed the home on several occasions and noted no improvement from the initial visit. The only change was in the smell. The FSW reported, "You could smell animal feces in the home."

The FSW arranged for a psychological evaluation of Mother with a parenting assessment component, which was performed by a licensed senior psychological examiner. The testing revealed Mother to have a mild to moderate intellectual disability. The examiner could not administer additional measures of mood or personality because Mother did not appear to understand the language of the assessment. The examiner also opined that Mother "lack[ed] sufficient decision-making ability to provide for the care of an infant child." Based on his interview of Mother and Grandmother, the examiner stated that Mother was in need of improved supervision herself.

2

DCS also arranged for an alcohol and drug assessment for Mother, which Mother completed.  The assessment resulted in no recommendations, but in random drug screens, Mother tested positive for marijuana and methamphetamine.  In addition, the FSW claimed Mother was not always cooperative with the screens.

Following a hearing on May 18, 2017, the juvenile court found Frederick to be dependent and neglected.  After hearing the testimony, Mother ultimately elected to stipulate that her child was dependent and neglected based on the allegations in the original petition.  On July 20, 2017, the court conducted a dispositional hearing at which it ordered the child to remain in the custody of DCS.

B.

On August 30, 2017, DCS filed a petition to terminate the parental rights of Mother and a putative father.[1]  As grounds for terminating Mother's parental rights, the petition alleged abandonment by failure to establish a suitable home, persistent conditions, and mental incompetency.

On the day of trial, Mother was present in the courtroom with her counsel.  But before the proceeding got underway, Mother left the courtroom, telling her attorney, "I default."  The trial proceeded with the court hearing testimony from the licensed psychological examiner who performed Mother's psychological evaluation, the FSW, and the foster mother caring for Frederick.

The licensed psychological examiner testified about the findings from his evaluation but also about his overall impressions of Mother.  He described Mother as inappropriately flirtatious during their encounter and highly impulsive.  At one point, Mother opened the door and walked into another counselor's office while a session was in progress.  In the short period of time Mother was in the waiting room, she engaged in inappropriate conversation, such as asking for phone numbers and sharing her phone number.  When the examiner asked her questions, Mother would respond, but quickly changed the subject to discuss irrelevant matters.  In his view, Mother appeared to enjoy attention and engaging in conversation.

Mother admitted to the examiner that she "smoke[d] weed every once in a while." She told him that she would "smoke a twenty sack or get a five dollar bag and bring it

---

[1]Initially, both Mother and Grandmother denied knowing who might be the father.  Later Mother stated her former fiancé, a man four decades older than Mother, "may be the father."  The putative father waived his parental rights, *see* Tenn. Code Ann. § 36-1-111(w), -117(a) (Supp. 2018), and they are not at issue in this appeal.

home." Mother also told the examiner that she had previously been diagnosed with schizophrenia and depression. Grandmother later confirmed these prior diagnoses.

The examiner testified that he did not believe that Mother could parent Frederick even with the support of her mother. He stated that, because of the areas of her cognitive impairment, there was no education or training that could change Mother's ability to care for the child.

Among other things, the FSW also testified about concerns with Mother's ability to care for Frederick. According to the FSW, during visitation, Mother did not want to interact with the baby. And Mother did not know how to hold or feed him. Therapeutic visitation to assist Mother with parenting did not improve matters. The FSW testified that, during visits, Mother was very distracted. Mother would leave the baby with Grandmother, walk out of the room, and begin talking with people in the office. Mother also fell asleep during two visits.

The foster mother testified that Frederick came into the home that she shares with her husband and their five-year-old child at seven days old. When Frederick arrived, the family noticed immediately that something was wrong. Frederick was diagnosed with

> Hypertonia[2] in his muscles, dysphasia,[3] which is characteristic in his face, torticollis[4] in his neck, dysmorphic features, and . . . a spot on his head. And then he also, through his genetics doctor, has -- his blood work has shown that there's a deletion of his seventh chromosome, which is leading to Williams syndrome.[5]

The foster mother explained that Williams syndrome was a "developmental disorder" that "can lead to heart defects, [intellectual disability], and autistic behaviors."

---

[2] Hypertonia or hypertonicity is "[a]n excess of muscular or arterial tone or intraocular pressure." *Hypertonia*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (21st ed. 2009).

[3] Dysphasia is a type of speech impairment "resulting from a brain lesion or neurodevelopmental disorder." *Dysphasia*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (21st ed. 2009).

[4] Torticollis is "[s]tiff neck associated with muscle spasm, classically causing lateral flexion contracture of the cervical spine musculature." *Torticollis*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (21st ed. 2009).

[5] Williams syndrome is "[a] rare congenital disorder caused by a deletion of part of chromosome 7 characterized by impaired growth, heart disease, hypercalcemia, mental retardation, sensitivity to loud sounds, and 'elfin' facial features, among other anomalies." *Williams syndrome*, TABER'S CYCLOPEDIC MEDICAL DICTIONARY (21st ed. 2009).

While in foster care, Frederick had seen several doctors. And his continuing care would require travel. His genetics doctor, with whom he had an appointment every three to six months, was located in Nashville. He also saw a pulmonologist in Memphis every three to six months.

Besides doctor visits, the foster mother described some of the other demands of caring for Frederick.

> [The child] is in physical therapy twice a week, occupational therapy twice a week, speech therapy and that's with eating and his speech, once a week, and educational therapy once a week. So he's in six therapies a week.

> And with that, he also attends therapy and learning school . . . all five days. And the therapist[s] kind of work with his teachers and then he gets help throughout the day to work on that and work on the same things at home.

The foster mother testified that, despite the challenges, Frederick was doing very well in her home. At the time of the trial, Frederick had been sitting up for a few months and had recently begun to crawl. But he still tumbled over because of his reflexes.

The foster mother shared her and her family's desire to adopt Frederick. She also claimed that, if he was taken from their home, they would be devastated. She said they had to make many adjustments for Frederick, but it was now their "new normal." The foster mother believed Frederick would also have difficulty if he was removed from their care. According to foster mother, Frederick did not go to people easily and had a hard time adjusting to new things. He was very attached to the familiar including his cups and where he eats. He even had difficulty changing classrooms at his school.

The foster mother also expressed concern over the impact of a move on Frederick's health care. An issue with his breathing had sent the child to the hospital for a week. The doctors told the foster mother that she could expect the breathing problems to reoccur. Frederick must also take a daily medication because he aspirates when he drinks liquids and a special thickener must be added to drinks.

After considering the proof, the juvenile court terminated Mother's parental rights. The court concluded that DCS had proven each of three statutory grounds for termination alleged against Mother in its petition. The court also concluded that it was in Frederick's best interest for Mother's parental rights to be terminated.

## II.

A parent has a fundamental right, based in both the federal and State constitutions, to the care and custody of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995). But parental rights are not absolute. *In re Angela E.*, 303 S.W.3d at 250. Our Legislature has identified those situations in which the State's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g) (2017).

Tennessee Code Annotated § 36-1-113 sets forth both the grounds and procedures for terminating parental rights. *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). First, parties seeking termination of parental rights must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated § 36-1-113(g). Tenn. Code Ann. § 36-1-113(c)(1). Second, if one or more statutory grounds for termination are shown, they then must prove that terminating parental rights is in the child's best interest. *Id.* § 36-1-113(c)(2).

Because of the constitutional dimension of the rights at stake in a termination proceeding, parties seeking to terminate parental rights must prove both the grounds and the child's best interest by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). This heightened burden of proof serves "to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights." *Id.* "Clear and convincing evidence" leaves "no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

On appeal, we review the trial court's findings of fact "de novo on the record, with a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); Tenn. R. App. P. 13(d). We then "make [our] own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim." *In re Bernard T.*, 319 S.W.3d at 596-97. We review the trial court's conclusions of law de novo with no presumption of correctness. *In re J.C.D.*, 254 S.W.3d 432, 439 (Tenn. Ct. App. 2007).

Mother appeals from the termination of her parental rights arguing that it was not in Frederick's best interest to terminate her parental rights. She presents no argument challenging the grounds for termination found by the trial court. Nonetheless, we must address each ground for termination because we are required to "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn.), *cert. denied sub nom. Vanessa G. v. Tenn. Dep't of Children's Servs.*, 137 S. Ct. 44 (2016).

## A. GROUNDS FOR TERMINATION

### 1. Persistence of Conditions

DCS concedes on appeal that one ground for termination relied on by the trial court, persistence of conditions, was not applicable. After reviewing the record, we agree.

At the time the petition was filed,[6] persistence of conditions applied when the "child has been removed from the home of the parent . . . by order of a court for a period of six (6) months." Tenn. Code Ann. § 36-1-113(g)(3). The six month period has generally been measured from the order adjudicating the child dependent and neglected. *See In re Audrey S.*, 182 S.W.3d 838, 875-76 (Tenn. Ct. App. 2005). In this case, although the adjudicatory hearing on the petition for dependency and neglect was held on May 18, 2017, the juvenile court did not enter an order on the hearing until September 5, 2017, a week after the petition for termination was filed. So the statutory ground of persistence of conditions does not apply.

### 2. Abandonment

One of the statutory grounds for termination of parental rights is "[a]bandonment by the parent." Tenn. Code Ann. § 36-1-113(g)(1). The General Assembly has provided "five alternative definitions for abandonment as a ground for the termination of parental rights." *In re Audrey S.*, 182 S.W.3d at 863; *see also* Tenn. Code Ann. § 36-1-102(1)(A) (2017) (defining the term "abandonment"). The juvenile court concluded that Mother abandoned the child under the second definition: abandonment by failure to provide a suitable home. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii).

---

[6] The General Assembly revised Tennessee Code Annotated § 36-1-113(g)(3) to provide, effective July 1, 2018, as follows: "The child has been removed from the *home or the physical or legal custody of a parent or guardian* for a period of six (6) months by *a court order entered at any stage of proceedings* in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child . . . ." 2018-2 Tenn. Code Ann. Adv. Legis. Serv. 174, 175 (ch. 875) (LexisNexis) (emphasis added); *see also* Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2018).

7

A child has been abandoned under the second statutory definition if the child has been removed from the home of a parent as a result of a petition filed in juvenile court, which ultimately results in a finding that the child was dependent and neglected, and

> for a period of four (4) months following the removal, the department . . . has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but . . . the parent . . . ha[s] made no reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A)(ii). DCS's efforts to assist the parent "may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal." *Id.* In evaluating those efforts, we are concerned with the time period from September 15, 2016, the day following Frederick's removal, to January 14, 2017.

The juvenile court found that there was clear and convincing evidence that DCS's efforts to assist were reasonable. Based on our review of the record, we agree. The efforts of DCS exceeded the efforts of Mother and Grandmother. So we next must consider whether Mother failed to establish a suitable home and demonstrated a lack of concern for her child to such a degree that it appeared unlikely that she would be able to provide a suitable home for her child at an early date.

"A suitable home 'requires more than a proper physical living location.'" *In re Navada N.*, 498 S.W.3d 579, 595 (Tenn. Ct. App. 2016) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). A suitable home requires "[a]ppropriate care and attention . . . to the child." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at * 7 (Tenn. Ct. App. Apr. 20, 2016). The home must also "be free of drugs and domestic violence." *In re Hannah H.*, 2014 WL 2587397, at *9.

We conclude that clear and convincing evidence supported the statutory ground of abandonment by failure to provide a suitable home. Here, not only did Mother not have a proper physical living location, Mother could not provide a home free of drugs. At the time of the child's removal, the FSW stated that there were foundation problems with the home and that "[t]here were holes in the floor" and "the floors were uneven." The room intended for Frederick "was blocked off with a boulder or something." The FSW observed that there were no changes in the condition of the home after removal of Frederick. Mother tested positive for marijuana usage when Frederick was born. And she admitted to continuing marijuana usage just over two months prior to the filing of the petition for termination of parental rights.

8

Mother's intellectual disability was mild to moderate. But Mother's behavior established that she would be unlikely to establish a suitable home in the near future. During visitation, Mother did not want to interact with her child and became easily distracted to the point where she would leave the child in Grandmother's care. She also fell asleep during visitation. Despite DCS providing for therapeutic visitation, Mother seemed incapable of giving her child appropriate care and attention.

3. Mental Incompetence

The final statutory ground found by the juvenile court was mental incompetence. Under this ground, a parent's rights may be terminated if,

> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future . . . .

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

Clear and convincing evidence supports the juvenile court's finding that Mother was incompetent to adequately provide for the care of her child. The psychological examiner testified that Mother "lack[ed] sufficient decision-making ability to provide for the care of an infant child and that she's in need of improved supervision herself." He further stated that there was no education or training that Mother could complete that would improve her ability to parent a child. As such, it was unlikely that Mother would be able to assume care of the child in the near future.

### B. BEST INTEREST OF THE CHILD

Because "[n]ot all parental misconduct is irredeemable," our parental termination "statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). So even if a statutory ground for termination is established by clear and convincing evidence, we must also determine whether termination of parental rights is in the child's best interests. Tennessee Code Annotated § 36-1-113(i) lists nine factors that courts may consider in making a best interest analysis. "These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017). In reaching a decision, "the court must consider all of the statutory factors, as well as any other relevant proof any party offers." *Id.* at 682.

9

The focus of this analysis is on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. Additionally, the analysis should take into account "the impact on the child of a decision that has the legal effect of reducing the parent to the role of a complete stranger." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App. June 26, 2006). Although "[f]acts relevant to a child's best interests need only be established by a preponderance of the evidence, . . . the combined weight of the proven facts [must] amount[] to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535.

After considering the evidence in light of the statutory factors, the juvenile court found that statutory factors 1, 2, 4, 5, 7, and 8 favored termination of Mother's parental rights. *See* Tenn. Code Ann. § 36-1-113(i). The evidence does not preponderate against the juvenile court's factual findings.

The first statutory factor focuses on whether the parent "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the [parent's] home." Tenn. Code Ann. § 36-1-113(i)(1). Mother made no adjustment in her circumstances, conduct, or conditions. Mother lived in the same house under a conservatorship. As reported by the medical staff in the hospital where Frederick was born, during visitation, Mother showed no interest in Frederick, even walking out of the room and leaving the child with Grandmother.

Similarly, the second factor considers the potential for lasting change by asking "whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible." *See id.* § 36-1-113(i)(2). Due to Mother's difficulties with attending to the child and participating in visitation, the FSW arranged for therapeutic visitation. Mother made no progress during the therapeutic visitation, and the FSW concluded that Mother was unlikely to make any progress due to her mental abilities. And as noted above, the psychological examiner stated that there was no education or training that would improve Mother's ability to care for Frederick.

Mother argues that DCS should have brought in a representative from the agency providing therapeutic visitation to testify regarding Mother's improving abilities instead of the FSW. But the FSW's testimony that Mother was distracted during visitation and would leave the room, that Mother fell asleep during visitation, and that Mother was unable to care for the child went unrebutted. The trial court concluded that the FSW's testimony was credible.

The fourth factor concerns the relationship between parent and child. *See id.* § 36-1-113(i)(4) ("Whether a meaningful relationship has otherwise been established between the parent . . . and the child."). The child was removed from Mother when he was seven days old. By the time of the trial, Frederick had been removed from Mother's care for

10

nearly eighteen months. The only possible means for establishing a relationship between Mother and child was during visitation. But Mother showed little to no interest in Frederick. It is apparent that there is not much of a relationship between Mother and Frederick.

The fifth factor evaluates the effect a change in caregivers would have on the child's emotional and psychological condition. *See id.* § 36-1-113(i)(5). The record supports a finding that a change in caregivers would detrimentally impact Frederick. He has many special needs, and the foster parents expended great effort to see that those needs were meet. The efforts included driving to both Memphis and Nashville to see specialists and ensuring that Frederick attended his regular occupational, speech, and educational therapy multiple times a week closer to home. The foster mother stated that they had made many adjustments in their home to help Frederick cope with such issues as sensitivity to sound. There was little likelihood that Mother could provide the care that Frederick needed.

The seventh factor focuses on the parent's home environment and ability to be a safe and stable caregiver. *See id.* § 36-1-113(i)(7) ("Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of [intoxicants] as may render the parent . . . consistently unable to care for the child in a safe and stable manner."). Mother tested positive for various drugs throughout the time leading up to the parental termination hearing. The psychological examiner testified that Mother herself was in need of more supervision. Additionally, Mother's physical home was unsafe for a child.

The eighth factor looks to the parent's mental and/or emotional status. *See id.* § 36-1-113(i)(8) ("Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child . . . .") As discussed above, the evidence established that Mother has a mild to moderate intellectually disability and that she was incapable of caring for herself, let alone a child.

In her brief, Mother points out that the foster mother testified that, if they were allowed to adopt Frederick, the foster parents would not allow any contact with Mother. Mother argues that many adoptive parents allow minimal contact and that the refusal of future contact with a birth mother should be considered in the best interest factors. It may be true that many adoptive parents allow contact with birth mothers, but the best interest analysis focuses on what is best for the child, not what is best for the parent. *In re Marr*, 194 S.W.3d at 499. The record includes no evidence to support that continued contact with Mother would be in Frederick's best interest.

Considering the record as a whole, we conclude that the combined weight of the proof amounts to clear and convincing evidence that termination of Mother's parental

rights was in the child's best interest. Mother's mental challenges prevent her from being able to parent Frederick. She showed little to no interest in Frederick from the time he was born. While in the custody of DCS, Frederick has been in a stable, loving home environment with a foster family who wants to adopt him. The foster parents were also prepared to address Frederick's special needs.

## III.

The record contains clear and convincing evidence to support terminating Mother's parental rights on two of the grounds relied upon by the juvenile court, abandonment by failure to establish a suitable home and mental incompetence. The record also contains clear and convincing evidence that termination is in the child's best interest. Thus, we affirm the judgment terminating Mother's parental rights.

_____
W. NEAL MCBRAYER, JUDGE